STEPHANIE M. HINDS (CABN 154284)
Acting United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

CHRISTOFFER LEE (CABN 280360)
Assistant United States Attorney

    150 Almaden Boulevard, Suite 900
    San Jose, California 95113
    Telephone: (408) 535-5095
    FAX: (408) 535-5081
    christoffer.lee@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>MARK DEHART,<br><br>    Defendant. | CASE NO. 5:21-mj-71523-MAG<br><br>UNITED STATES' EMERGENCY APPEAL AND MOTION TO REVOKE THE MAGISTRATE COURT'S PRE-TRIAL RELEASE ORDER FOR DEFENDANT MARK DEHART<br><br>Court:   Honorable Edward M. Chen<br>           (Duty District Court Judge) |

**NOTICE OF MOTION**

TO ALL PARTIES AND TO THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on October 5, 2021, the United States, pursuant to 18 U.S.C. § 3145, will and hereby does appeal United States Magistrate Judge Nathanael Cousins' pretrial release order issued on October 5, 2021 at approximately 2:00 p.m, and moves this Court for entry of an order revoking the magistrate court's release order. The magistrate court issued a temporary stay of the release order until 5:00 p.m. on October 5, 2021, or until further order of the Court. The United States

U.S.' EMERGENCY APPEAL AND MOTION TO REVOKE PRE-TRIAL RELEASE ORDER FROM N.D. CAL.
MAGISTRATE COURT
5:21-mj-71523-MAG

1

accordingly files this emergency motion and further moves this court to extend the stay of the magistrate court's release order, if necessary, until such time as the motion can be heard.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

Plaintiff United States of America, by and through its counsel of record, hereby moves to revoke the order granting pre-trial release to defendant Mark Dehart. The nature of the offense charged, the weight of the evidence supporting the charge, and defendant's personal history and characteristics, all demonstrate that the defendant poses a danger of non-appearance and is a danger to the community, risks that cannot be mitigated by any release conditions.

The United States charged defendant by criminal complaint filed September 27, 2021 with being a felon in possession of ammunition, in violation of 18 U.S.C. § 922(g)(1). This charge arises from a parole search of Defendant's residence, vehicle, and workplace on or about June 29, 2021 that uncovered two privately manufactured ("ghost gun") AR-15 assault rifles (one with a barrel length of only 8 5/8 inches), a Polymer 80 privately manufactured pistol, two Glock "switches" for converting semi-automatic pistols to fully-automatic machineguns, numerous gun part kits, weapons components, barrels, drill press, and a 3D printer—i.e. materials consistent with firearm manufacturing. Officers also located at least 17 grams net weight of methamphetamine found in multiple bags and locations, a hot plate with methamphetamine residue, digital scales, and sandwich bags—i.e. materials consistent with possession of methamphetamine for distribution. Officers also found dozens of rounds of rifle and pistol ammunition, some of which the government charged here by complaint due to Defendant's status as a felon. Defendant was a prohibited person because he was convicted in 2019 of Penal Code section 245(a)(2)-felony assault with a firearm, Penal Code section 245(a)(4)-felony assault with force likely to cause great bodily injury, Penal Code section 273.5(a)-felony inflicting corporal injury on a spouse, and Penal Code section 18720-felony manufacturing an explosive device without a permit.

The conduct underlying these 2019 convictions, which occurred in 2016, is particularly

concerning because Defendant has a history of violent assaults and possession of an explosive device capable of inflicting large-scale damage. In 2016, Defendant attacked his domestic partner on two occasions. In one instance, he assaulted her, tased her, and thrust a pistol into her mouth until she could not breathe; he then strangled her until she lost consciousness using a chokehold. During this incident, the victim reported that Defendant said, "I'll kill you and the cops. You know I'll get away with it." Several months later, Defendant set up a rifle on a tripod aimed at the front door of their shared home. When she walked in, he attacked her, took her phone, and again choked her until she lost consciousness. This time, Defendant told her, "Either one of us is dying tonight, or both of us are dying tonight." She only narrowly escaped.

In the ensuing investigation, San Jose police discovered a cache of weapons including a pistol, two rifles, a shotgun and parts to assemble firearms. Most troubling, officers discovered a fully functional pipe bomb built by Defendant, with green explosive fuse, filled with explosive powder, and wrapped with approximately fifty nails. Officers also found more fuse, electric matches, and remote detonators.

Defendant committed the instant crime shortly after paroling, and continues to display behavior indicating he poses a risk of danger and flight as recently as last week. More specifically, the government learned that Defendant was unavailable for his initial appearance in federal court, scheduled for September 29, 2021, because he was involved in an incident at Santa Rita Jail. While the details are still being investigated, it appears Defendant lost his temper, refused to obey commands, and used his cane to smash a window at the facility.

The government here moved for pretrial detention. The government filed a memorandum in support of detention. *See* Dkt. No. 3 (which is summarized below). The Pretrial Services bail report, Dkt No. 4, noted that Defendant had six probation revocations/violations, has used four aliases, two dates of birth, and three social security numbers or variations. Defendant's state parole officer indicated he believed Defendant was upset with roommates who shared the residence at which some of the

U.S.' EMERGENCY APPEAL AND MOTION TO REVOKE PRE-TRIAL RELEASE ORDER FROM N.D. CAL. MAGISTRATE COURT
5:21-mj-71523-MAG

3

concerning because Defendant has a history of violent assaults and possession of an explosive device capable of inflicting large-scale damage. In 2016, Defendant attacked his domestic partner on two occasions. In one instance, he assaulted her, tased her, and thrust a pistol into her mouth until she could not breathe; he then strangled her until she lost consciousness using a chokehold. During this incident, the victim reported that Defendant said, "I'll kill you and the cops. You know I'll get away with it." Several months later, Defendant set up a rifle on a tripod aimed at the front door of their shared home. When she walked in, he attacked her, took her phone, and again choked her until she lost consciousness. This time, Defendant told her, "Either one of us is dying tonight, or both of us are dying tonight." She only narrowly escaped.

In the ensuing investigation, San Jose police discovered a cache of weapons including a pistol, two rifles, a shotgun and parts to assemble firearms. Most troubling, officers discovered a fully functional pipe bomb built by Defendant, with green explosive fuse, filled with explosive powder, and wrapped with approximately fifty nails. Officers also found more fuse, electric matches, and remote detonators.

Defendant committed the instant crime shortly after paroling, and continues to display behavior indicating he poses a risk of danger and flight as recently as last week. More specifically, the government learned that Defendant was unavailable for his initial appearance in federal court, scheduled for September 29, 2021, because he was involved in an incident at Santa Rita Jail. While the details are still being investigated, it appears Defendant lost his temper, refused to obey commands, and used his cane to smash a window at the facility.

The government here moved for pretrial detention. The government filed a memorandum in support of detention. *See* Dkt. No. 3 (which is summarized below). The Pretrial Services bail report, Dkt No. 4, noted that Defendant had six probation revocations/violations, has used four aliases, two dates of birth, and three social security numbers or variations. Defendant's state parole officer indicated he believed Defendant was upset with roommates who shared the residence at which some of the

contraband was found and believed Defendant would approach these individuals regarding his disdain. Pretrial Services agreed Defendant posed a risk of non-appearance and danger to the community, and initially recommended detention unless sureties stepped forward to facilitate release to a residential treatment facility.  Dkt. No. 4.  On the morning of the detention hearing, Pretrial Services filed an amended report recommending release to a halfway house, followed by Pathways residential treatment facility, because three of Defendant's family members stepped forward and agreed to be co-signers on a $15,000 unsecured bond.  Dkt. No. 5.  Pretrial Services concluded that the sureties helped to mitigate the risk of non-appearance but identified no new mitigating or aggravating factors regarding danger to the community.

      Following a detention hearing and oral argument from both the government and defense counsel, and comment from the sureties (including their agreement to act as sureties), the Court adopted Pretrial Services' recommendation and released Defendant to the halfway house on the $15,000 unsecured bond. As noted by Magistrate Judge Cousins, relevant to his release order was the presence of the sureties and the current availability of a bed at the halfway house in San Francisco.  The court further imposed as relevant conditions that Defendant must appear at future proceedings, must not commit new law violations, must not have contact with witnesses, must not have firearms or other weapons, and must participate in substance abuse treatment and mental health counseling, amongst other conditions.

      The government asked the magistrate court to stay its release order.  The magistrate court stayed the release order until 5:00 p.m. today or until further order of the Court to permit the government to appeal to this Court.  The instant emergency appeal and motion to revoke follows.

      As demonstrated by the government's filed detention memorandum, and as set forth below, Defendant poses a danger to the community and risk of non-appearance that no conditions or combinations can mitigate.  The proposed release to the halfway house in San Francisco and later Pathways residential treatment does not address the danger to the community given the evidence that Defendant apparently has the technological skills and interest to acquire privately made firearms—notwithstanding conditions that

prohibit their possession, past violent acts including use of a firearm in a domestic violence incident and felony assault that lead to great bodily injury, and prior creation of an explosive device covered with fifty nails.  In short, release to a halfway house or residential treatment facility, notwithstanding conditions imposed by the Court, does not adequately assure the safety of the community or ensure that Defendant will appear for future proceedings.  This Court should order Defendant's pretrial detention.

## II. FACTUAL BACKGROUND

On June 29, 2021, Defendant unlawfully possessed ammunition as part of a broader pattern of destructive and dangerous conduct.  Defendant committed the instant offense while on state parole from several violent felonies.

As alleged in detail in the criminal complaint in this case, on June 29, 2021, local law enforcement conducted a parole compliance check on Defendant.  In Defendant's vehicle, officers located a bag containing approximately 17.2 grams of methamphetamine (gross weight), meth pipes, and two .22 caliber rounds of ammunition (one which had been expended).  Expended ammunition is consistent with use beyond possession.



At Defendant's residence, and inside a garage to which he appears to have had exclusive access, officers discovered a cache of dangerous weapons in close proximity to methamphetamine, sales indicia, and materials used to manufacture firearms.  Defendant possessed a short-barreled rifle (8 5/8 inches) (yellow circle; detail next page) on his couch near the methamphetamine, with hot plate and two digital scales (red circle).  Note the presence of additional firearms—.22 Polymer 80 pistol, white barrel of another assault rifle, and additional 5.56 upper receiver (all blue circle).

(IMG_0307 above, IMG_0297 below)



Below are pictures of the firearms, as documented by the Santa Clara County Crime Lab.





Officers also uncovered the makings of a firearms workshop. This is particularly relevant to the government's argument regarding danger to the community because it shows that Defendant's capacity and intent to evade the typical safeguards to prevent prohibited people (including felons like Defendant) from obtaining firearms. Specifically, officers uncovered evidence of parts kits that can be ordered from the internet from manufacturers such as Polymer 80. Officers uncovered additional yet-to-be-built firearms components including an assault rifle Polymer lower with no serial number, Polymer 80 pistol frame, and a Glock pistol conversion kit. The search also revealed the presence of an industrial grade drill press and 3D printer—both of which are tools used to manufacture and assemble component parts of privately made firearms. Officers also uncovered numerous pistol and rifle magazines containing ammunition of various calibers, as well as loose ammunition. The parts and tools recovered further show Defendant's intent to manufacture and arm himself with military grade weapons.

Of additional concern to public safety, law enforcement found at least two pistol silencers (and multiple oil filters which law enforcement suspected could be used as home-made silencers). A violent felon possessing silencers is concerning because silencers serve to muffle the sound of gunfire to avoid detection and escape apprehension. A silenced firearm can be used as a first-strike weapon.

Additionally, at the motorcycle shop where Defendant had a workspace, officers located evidence that Defendant received packages at that location. Officers also found a pistol barrel. When a co-worker later cleaned out Defendant's locker, the colleague uncovered—and turned over to police— two Glock switches. Glock auto switches are designed and intended to convert a semi-automatic pistol into a machinegun, enabling that pistol to have a rate of automatic fire of up to 1000 rounds per minute.

The above conduct occurred while Defendant was on parole; Defendant was not permitted to possess weapons, ammunition (or methamphetamine for that matter) while on parole. Defendant was also a felon. In fact, a protective order issued against Defendant with effective dates September 08, 2016 through September 08, 2021 stated: "The subject of this record is prohibited from receiving or possessing a firearm under federal law (Title 18, U.S.C., Section 922)." That the instant offense

occurred while on parole, and while Defendant was under a protective order specifically prohibiting the exact conduct Defendant is now charged with, underscores Defendant's inability to comply with court-ordered conditions, including conditions not to possess firearms or ammunition. Neither the record nor common sense support an inference that Defendant will treat conditions imposed as a part of federal pretrial release differently, including any conditions to refrain from possessing firearms, ammunition, or committing new crimes.

Defendant has a criminal history dating to 1998, including a 2002 misdemeanor conviction for false personation (Penal Code section 529) and a 2013 conviction for providing false ID to a peace officer (Penal Code section 148.9).

In 2016, however, Defendant committed several felony assaults, committed corporal injury on a spouse, and manufactured an explosive device without a permit. Because the conduct underlying these convictions bear on the danger to the community analysis, the government addresses each in turn, as drawn from the information in the corresponding police reports.

On February 16, 2016, Defendant assaulted his domestic partner, with whom he was living. After having a verbal argument and attempting to leave the residence, the victim returned to get her car keys. Defendant then pushed her into the bedroom and prevented her from leaving. Defendant grabbed a large taser and used it to shock the victim's neck. The victim described the feeling as having been bit by "fire ants." She called 9-1-1. Defendant then used his hands to choke her but he released his grip when she screamed into the phone her address and that she was being choked. It was unclear whether she had reached 9-1-1. Defendant then grabbed a handgun from the bedroom nightstand and shoved the barrel of the gun into the victim's eye. The victim asked him to stop. Defendant told her to shut up and then shoved the handgun into her mouth to the point that she could not breathe. The victim reported that Defendant said, "I'll kill you and the cops. You know I'll get away with it." The assault was stopped when police arrived at the house. Defendant instructed the victim to get rid of the police, and told her that he would not go to jail. Defendant said he would kill her, the police, and himself, all while holding

the gun. Apparently, she told the officers she had made a mistake and they left. She reported the incident several weeks later. The victim sustained redness and soreness throughout her body and photographed her injuries, according to the report.

On April 2, 2016, the victim returned home after spending time with friends. When she arrived at home, she entered the front door and saw that Defendant had set up a loaded rifle with scope and tripod, and had aimed it at the front door. Defendant then grabbed her by the hair and told her to "get up." She tried to retrieve her purse and phone to leave but Defendant said, "You don't get your fucking phone" and pulled it out of her hand. Defendant then put his arm around her neck in a chokehold to prevent her from leaving; he choked her until she lost consciousness. The victim reported waking up confused on the floor, at which point she got up and Defendant again began to choke her, this time, from the front. Defendant told her, "Either one of us is dying tonight, or both of us are dying tonight." Defendant then grabbed her phone to break it, at which point she ran out the side door to her car. Defendant followed and attempted to open her car door as she reversed. She screamed for her neighbors to help and hit the gas, knocking Defendant to the ground. A neighbor brought her into his house and called 9-1-1. When police arrived, Defendant claimed all of the guns and ammo in the house belonged to her and were not his.

Officers conducting a search for weapons found a Taurus 9mm handgun in the top drawer of the bedroom nightstand (the same location the victim described the gun being retrieved from in the February incident); it had a fully loaded magazine and a live round in the chamber (i.e. ready to fire with a single pull of the trigger). Officers also discovered in the closet a .22 caliber rifle, a 12-gauge shotgun, and a 30-06 rifle; both the shotgun and 30-06 rifle were fully loaded with rounds chambered. Additionally, officers found the upper component of an AR-15 with bolt and charging handle. (The AR-15 upper component found in 2016 is notable because it is also consistent with the private manufacture of firearms and is a similar component as the AR upper component found in Defendant's residence during the June 29, 2021 search).

Several days later, while cleaning out Defendant's possessions, the victim located what she believed to be a pipe bomb in Defendant's things. San Jose police officers retrieved the device and took it to the bomb squad range. The device was cylindrical in shape, about 2 inches wide by 2 inches tall, wrapped in gray duct tape, <u>covered with approximately 50 nails pointing up and down</u>, with a green fuse 6 inches long coming from the top of the device. An x-ray of the device revealed the presence of what appeared to be explosive powder inside the device. Bomb squad officers determined the devices was "very dangerous and capable of causing great bodily harm or death" and that the purpose of the nails taped against the container was "to provide blast fragmentation" meant "to maim and or kill." Bomb squad technicians were able to blow up the device in a controlled environment to render it safe. Police subsequently recovered from Defendant's home two rolls of the same explosive fuse used in the pipe bomb, roughly 50 "electric matches" in a box with Defendant's indicia, and a set of four remote control firing ignition systems. In addition to ammunition and another Polymer 80 pistol lower, officers found a book titled "100 Deadly Skills, the SEALS Operative's Guide," six walkie-talkies, and a heavy cooking pan used for target practice (showing proficiency with a high-powered rifle, according to the police report).

The Santa Clara County District Attorney's Office charged Defendant with 10 felonies following the incidents described above. Defendant apparently remained in custody pre-trial and pled no contest to Penal Code section 245(a)(2), felony assault with a firearm; Penal Code section 245(a)(4), felony assault with force likely to cause great bodily injury; Penal Code section 273.5(a), felony inflicting corporal injury on a spouse; and Penal Code section 18720, felony manufacturing an explosive device without a permit. Defendant pled no contest on April 4, 2019 and was sentenced on May 23, 2019 to six years prison (3 years on the felony assault with a firearm and three one-year consecutive sentences on the other charges). With credits for time served, it appears he was released onto parole. He remained on parole until the June 29, 2021 arrest that led to the instant charges.

With respect to the June 29, 2021 conduct, the Santa Clara County District Attorney's Office

initially charged Defendant for this conduct, including charges related to unlawful possession of firearms and ammunition. Defendant was apparently held to answer, detained pre-trial, and the District Attorney's Office dismissed the state charges against Defendant in lieu of federal prosecution, at which point Defendant was transported to federal custody.

### III.   ARGUMENT

The district court's standard of review is de novo:  "[A] district court's review of a magistrate's detention order is to be conducted without deference to the magistrate's factual findings." *United States v. Koenig*, 912 F.2d 1190, 1192 (9th Cir. 1990).  The rules of evidence do not govern what information may be presented.  18 U.S.C. §3142(f); Fed. R. Evid. 1101(d)(3).

The Bail Reform Act of 1984 permits pretrial detention of a defendant without bail where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1).  Detention is appropriate where a defendant is either a danger to the community or a flight risk; it is not necessary to prove both.  *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985).

In evaluating whether a defendant should be detained pretrial, the court's finding that a defendant is a danger to the community must be supported by clear and convincing evidence, 18 U.S.C. § 3142(f)(2)(B), and the court's finding that a defendant is a risk of non-appearance need only be supported by a preponderance of the evidence, *Motamedi*, 767 F.2d at 1406.  "[T]he Bail Reform Act mandates an [1] individualized evaluation [2] guided by the factors articulated in § 3142(g)." *See United States v. Diaz-Hernandez*, 943 F.3d 1196, 1199 (9th Cir. 2019).  Categorical grants or denials of bail, not tethered to an individualized determination, are impermissible.  *Id*.  Consideration of factors outside the articulated factors set forth in section 3142 is also disfavored.  *Id*.

The Court must consider four factors in determining whether the pretrial detention standard is met:  (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including the defendant's character,

physical and mental condition, family and community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings, as well as whether the crime was committed while the defendant was on probation or parole; and (4) the nature and seriousness of the danger to any person or to the community that would be posed by the defendant's release. *See United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986).

### IV. SECTION 3142(G) FACTORS WEIGH IN FAVOR OF DETENTION AND SHOW DEFENDANT IS A DANGER TO THE COMMUNITY AND RISK OF NON-APPEARANCE.

Under 18 U.S.C. § 3142(g)(1), the nature and circumstances of the charged offense weigh heavily in favor of detention. Defendant's conduct charged here is extremely serious. He possessed ammunition as a felon, but the relevant conduct surrounding the charged offense shows Defendant possessed multiple assault rifles (including at least one short-barreled rifle), a pistol, multiple firearm parts, silencers, and Glock auto switches for converting semi-automatic pistols to fully automatic machineguns. Defendant was on parole at the time and already subject to a no-firearms condition that specifically prohibited the very conduct he is now charged with. Whereas Defendant's possession of silencers is concerning because silencers create the ability to kill in secret, possession of a short-barreled rifle and Glock switches make it easy to inflict maximum damage as quickly as possible. That Defendant appeared to be manufacturing weapons is likewise deeply concerning given Defendant's status as a felon and the above-described violent tendencies, both historical and recent. Moreover, it should be noted that officers recovered an expended .22 round in Defendant's car trunk, consistent with actual use of firearms.

Under section 3142(g)(2), the weight of the evidence favors detention. Evidence of Defendant's guilt and likely lengthy period of incarceration "makes it more likely that he will flee," particularly in light of the term of federal imprisonment that Defendant potentially faces here. *See United States v. Gebro*, 948 F.2d 1118, 1122 (9th Cir. 1991) (affirming district court finding government met burden of showing flight risk and danger to the community in motion for pretrial detention pending re-trial where

defendant faced lengthy period of incarceration).  The fact that Defendant has been previously convicted in state court and received a comparatively light sentences (six years but three years actual) amplifies the risk of flight here.  In contrast, on the charged section 922(g)(1) offense alone, Defendant now faces a statutory maximum of ten years in federal prison, with a preliminary guidelines range calculation that places him at the statutory maximum (assuming total offense level of 32, with enhancements for possessing 3-7 firearms and possessing ammunition in connection with another felony offense, before adjustments for acceptance and Criminal History Category of IV) of 168-210 months imprisonment.[1]  Even if he were to receive a sentence at the bottom of the guidelines range (which is by no means a fait accompli given his criminal history), he would face significantly more time than he has ever served before.

Under section 3142(g)(3) and (g)(4), Defendant's history and characteristics and the nature and seriousness of the danger posed to the community upon release favor detention.  Defendant's prior violent assaults and domestic violence, which involved use of a firearm and great bodily injury, show Defendant is capable of committing grave violence.  Defendant's creation of an operational explosive device laden with nails as shrapnel likewise should concern the Court, especially when coupled with the other tools he possessed in the instant case—all of which form a pattern of possessing weapons that can be used to inflict mass casualties.  Defendant's 2016 threats to kill the victim and police, apparent marksmanship, and access to such weapons (as well as the ability or interest in manufacturing them) should additionally give the Court pause regarding whether any conditions can adequately protect the public in light of Defendant's evident knowledge and experience.  Last, on the day Defendant was supposed to appear for his initial appearance in federal court, he evidently lost his temper and smashed a window at the jail using the only weapon he could find—his cane.

---

[1] This is a preliminary guidelines calculation for the purposes of this detention memorandum only and does not bind the government in future filings or submissions related to sentencing, which may be informed by additional information and the benefit of a presentence investigation.

U.S.' EMERGENCY APPEAL AND MOTION TO REVOKE PRE-TRIAL RELEASE ORDER FROM N.D. CAL. MAGISTRATE COURT
5:21-mj-71523-MAG

The above shows Defendant is not amendable to pretrial supervision, poses a serious risk of non-appearance, and is a danger to the community under the section 3142(g) factors.

It appears that central to Magistrate Judge Cousins' release order was the presence of three sureties and the space available at the halfway house. The primary reason to detain this defendant is a risk-based analysis. According to the initial bail report (Dkt. No. 4), one of Defendant's sureties (his sister) has had no contact with Defendant in the last 18 months. Defendant's mother reported that Defendant has had no contact with his brother in two years, but his brother (another surety) reported he has monthly contacts. Defendant's brother appears to live in Nevada and mother lives near the Nevada/California border. His family members would not be able to monitor his activity. In light of the prior offense conduct, the nexus between past firearm use in acts of violence and present firearm and ammunition possession, the apparent ability and interest to possess privately manufactured firearms and explosive devices, as well as recent anger management issues (vandalism at Santa Rita Jail), there is simply too much risk here that this Defendant will put the community at risk of further harm, and the pretrial release conditions imposed in the case do not address that danger. Likewise, Defendant's significant sentencing exposure and past violations of probation likewise show Defendant is a risk of non-appearance.

//
//
//
//
//
//
//
//
//

## IV. CONCLUSION

For these reasons, the United States respectfully requests that this Court find that the United States has established by clear and convincing evidence that the defendant is a danger to the community or that it has established by a preponderance of the evidence that defendant is a flight risk, that there are no conditions or combination of conditions that will reasonably assure the safety of the community, and order Defendant detained pre-trial.

In the alternative, the United States respectfully requests this court to extend the stay of the magistrate court's release order, if necessary, until such time as the motion can be heard.

DATED: October 5, 2021

Respectfully submitted,

STEPHANIE M. HINDS
Acting United States Attorney

 /s/ Christoffer Lee
CHRISTOFFER LEE
Assistant United States Attorney